UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAMIEN SCOTT MUDGE,<br>Petitioner,<br>-v.-<br>PAISLEY GAMBLE,<br>Respondent. | 26 Civ. 1102 (KPF)<br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

KATHERINE POLK FAILLA, District Judge:

After concluding that she had made two mistakes — the first involving her marriage to Petitioner Damien Scott Mudge and the second involving her decision to reside with Mr. Mudge and their minor child in coastal Mexico — Respondent Paisley Gamble set out in the second half of 2025 to extricate herself from both of them. To that end, Ms. Gamble made multiple trips to New York City to secure a residence for herself and her child, referred to here as "B.M.," as well as a school placement for B.M. And in September 2025, while her estranged husband underwent and recuperated from surgery, Ms. Gamble fled Mexico for New York City with B.M. and never returned.

Now before the Court is Mr. Mudge's Petition, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 1343 U.N.T.S. 89 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011, against Ms. Gamble to obtain the return of B.M. For the reasons set forth below, the Court grants the Petition.

## PROCEDURAL HISTORY[1]

On February 9, 2026, Mr. Mudge filed the Petition in this Court along with a motion for an expedited hearing and supporting papers. (Dkt. #1, 3). In recognition of the Hague Convention's target of resolving such petitions within "six weeks from the date of commencement of the proceedings," Hague Convention, art. 11, the Court promptly issued an Order to Show Cause and set a show cause hearing date for March 10, 2026. (Dkt. #5). At Mr. Mudge's request, the Court then adjourned the hearing by approximately a week. (Dkt. #10). On March 11, 2026, Ms. Gamble filed her opposition to the Petition and supporting papers. (Dkt. #11-13).

The Court held the show cause hearing on March 18, 2026, at which hearing the Court strongly urged the parties to consider alternative dispute resolution, while acknowledging the need for discovery and an evidentiary hearing if this case were to move forward. (Mar. 18 Tr. 5-6, 10-11). The Court set May 4, 2026, as the date of the evidentiary hearing and directed the parties

---

1 The facts set forth in this Opinion are drawn from the testimony and exhibits entered into evidence at the May 4, 2026 evidentiary hearing (*see* May 4, 2026 Minute Entry; Dkt. #37), as well as the parties' post-hearing proposed findings of fact and conclusions of law (Dkt. #31, 34).

For ease of reference, the Court refers to the various exhibits entered into evidence at the evidentiary hearing using the citing convention "Ex. P-[ ]" if offered by Petitioner and "Ex. R-[ ]" if offered by Respondent, and to their joint stipulation of undisputed facts as "Joint Stip." It refers to the transcript of the show cause hearing as "Mar. 18 Tr." (Dkt. #19) and to the transcript of the evidentiary hearing as "May 4 Tr." (Dkt. #37). In addition, it refers to Petitioner's proposed findings of fact and conclusions of law as "Pet. FFCL" (Dkt. #34) and to Respondent's proposed findings of fact and conclusions of law as "Resp. FFCL" (Dkt. #31). Finally, the Court references the declarations of direct testimony from certain witnesses, which statements were submitted in advance of, and entered as exhibits at, the evidentiary hearing using the citing convention "[Name] Decl."

to file a joint letter shortly after the show cause hearing to share their thoughts on mediation as well as their proposed discovery schedule. (*Id.* at 15-17; March 18, 2026 Minute Entry). In their joint letter, which was submitted on March 25, 2026, and approved by the Court a day later, the parties set forth a schedule for discovery and pre-hearing deadlines, and they also agreed to participate in settlement discussions presided over by United States Magistrate Judge Sarah Netburn. (Dkt. #15, 17). Accordingly, the Court issued an order of referral to Judge Netburn in hopes of obviating the need for an evidentiary hearing and thereby minimizing the costs — in terms of both resources and emotions — to the parties and their child. (Dkt. #18). At the same time, as the Court made clear to the parties at the show cause hearing, the Court intended to keep the date of the evidentiary hearing "as firm as possible" should the parties fail to settle. (Mar. 18 Tr. 17).

In the weeks leading up to the evidentiary hearing, Judge Netburn made multiple valiant attempts to settle this case, including adjourning the pre-trial deadlines to accommodate the parties' settlement discussions, but ultimately to no avail. (*See* Dkt. #21, 23; April 9, 2026 Minute Entry). On April 29, 2026, a few days before the evidentiary hearing, the Court held a telephonic final pretrial conference with the parties to confirm their intent to proceed and discuss the logistics of the evidentiary hearing. (*See* Dkt. #29; April 29, 2026 Minute Entry). The parties submitted their joint stipulation of undisputed facts as well as their individual witness lists, witness direct declarations,

exhibit lists, and exhibits to the Court on April 27, 2026, and May 3, 2026. (*See, e.g.*, Dkt. #27 (Respondent's witness list)).

Before the May 4, 2026 evidentiary hearing, Petitioner prepared six witness declarations to be entered into evidence, including those made by:

- Mr. Mudge himself;
- Mario Herrera, Mr. Mudge's counsel in Mexico representing him in the custody proceedings;
- Megan Morley, the parties' former neighbor when they resided in Florida from 2021 through 2023;
- Andrew Schisler, who is friends with both parties;
- Courtney Geelan, who is friends with both parties; and
- Mary Margaret Valloni, who is friends with both parties.

(*See generally* Petitioner's witness list). For her part, Respondent prepared eight witness declarations to be entered into evidence, including those made by:

- Ms. Gamble herself;
- Holly Minkkinen, B.M.'s nanny in Mexico;
- Cyndi Lindenberger, B.M.'s nanny in Florida;
- Libia Montero, Ms. Gamble's counsel in Mexico;
- Dana Weinberger, B.M.'s speech therapist;
- Brigette Sandry, Ms. Gamble's sister;
- Billy Joe Buttery, the parties' personal chef in Mexico; and
- Teresa Lesher, Ms. Gamble's friend.

(*See generally* Respondent's witness list).

At the evidentiary hearing, Ms. Gamble called Mr. Herrera as the only witness for cross-examination, while Mr. Mudge called Ms. Montero and Ms. Gamble herself as witnesses for cross-examination. (*See generally* May 4 Tr.). Mr. Herrera and Ms. Montero both testified via videoconference, and Ms. Gamble testified in person. (*See generally id.*). After the hearing, with the consent of Ms. Gamble, Mr. Mudge also submitted a rebuttal declaration by Lindsay Whitman, a clinical pediatric neuropsychologist, to address issues of speech therapy raised by Ms. Gamble at the hearing. (May 4 Tr. 115; *see* Whitman Decl.).

In addition to witness testimony, the Court received and entered into evidence numerous exhibits, and it also directed the parties to file simultaneous post-trial briefing within 30 days of the hearing. (*See generally* May 4 Tr.). On June 4, 2026, Ms. Gamble filed her proposed findings of fact and conclusions of law. (Dkt. #31). And on June 5, 2026, Mr. Mudge filed his proposed findings of fact and conclusions of law. (Dkt. #34).

**APPLICABLE LAW**

Adopted in 1980, the Hague Convention addresses "the problem of international child abductions during domestic disputes." *Golan* v. *Saada,* 596 U.S. 666, 670 (2022) (internal quotation marks omitted) (quoting *Abbott* v. *Abbott*, 560 U.S. 1, 8 (2010)). The purpose of the Hague Convention is

> to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access[.]

Hague Convention, pmbl. Both the United States and Mexico are among the Hague Convention's hundred-plus signatories. *See Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Status Table*, Hague Conference on Private Int'l Law, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited June 16, 2026).

"The [Hague] Convention's core premise is that the interests of children in … matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (internal quotation marks omitted) (quoting *Monasky* v. *Taglieri*, 589 U.S. 68, 72 (2020)). In accordance with this principle, the Hague Convention "generally requires the 'prompt return' of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* (quoting Hague Convention, art. 1(a)). Signatories are instructed to "take all appropriate measures to secure within their territories the implementation of the objects of the Convention," using "the most expeditious procedures available." Hague Convention, art. 2.

Congress enacted ICARA in 1988 to implement the Hague Convention in the United States. *Swett* v. *Bowe*, 733 F. Supp. 3d 225, 242 (S.D.N.Y. 2024). Specifically,

> [a]ny person seeking to initiate judicial proceedings under the [Hague] Convention for the return of a child … may do so by commencing a civil action by filing a petition for the relief sought in any court … which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

22 U.S.C. § 9003(b). In adjudicating such a petition, the court must "determine only [the parties'] rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

Under ICARA, the party petitioning for the return of a child bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. 22 U.S.C. § 9003(e)(1). Removal or retention of a child is wrongful when (i) "the child was habitually resident in one State and has been removed to or retained in a different State"; (ii) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (iii) "the petitioner was exercising those rights at the time of the removal or retention." *Gitter* v. *Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005). If the petitioner can establish the wrongful removal or retention of his child, then he has made out a *prima facie* case for the child's return. *In re D.T.J.*, 956 F. Supp. 2d 523, 528 (S.D.N.Y. 2013).

Nevertheless, where a petitioner has made out a *prima facie* case for the child's return, the respondent can still prevent the repatriation of the child if she is able to establish that "one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); *see also id.* § 9003(e)(2). These exceptions include:

- At least one year has passed since the "date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State" and "the child is now settled in its new environment," Hague Convention, art. 12;

- "[T]he person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," *id.*, art. 13(a)

- "[T]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," *id.*, art. 13(b); or

- "The return of the child ... would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id.*, art. 20.

The first two of the exceptions must be established by a preponderance of the evidence, *see* 22 U.S.C. § 9003(e)(2)(B), while the third and fourth must be established by clear and convincing evidence, *see id.* § 9003(e)(2)(A).

At the same time, the four exceptions are meant to be "narrow." *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) ("*Blondin II*") (quoting 22 U.S.C. § 9001(a)(4)). Critically, they "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Id.* Indeed, "a systematic invocation of these exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the [Hague] Convention by depriving it of the spirit of mutual confidence which is

its inspiration." *Id.* (alteration adopted and internal quotation marks omitted) (quoting Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law*, *in* 3 Acts and Documents of the Fourteenth Session 426 (1980)). Accordingly, even "where a defense has been established, 'it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation.'" *Swett*, 733 F. Supp. 3d at 243 (quoting *In re D.T.J.*, 956 F. Supp. 2d at 529).

**CREDIBILITY DETERMINATIONS**

To the extent that the Court relies on any witness's testimony, the Court's findings of fact reflect its determination as to that witness's credibility based on the Court's assessment of the witness's demeanor and potential bias, as well as the extent to which the testimony is "inherently logical and consistent with the testimony of other witnesses and relevant documentary evidence." *Swett*, 733 F. Supp. 3d at 243.

With respect to Petitioner's only testifying witness, Mr. Herrera, the Court finds him to be broadly credible, as his testimony is internally consistent and supported by documentary evidence. However, neither of Respondent's testifying witnesses — Ms. Montero and Ms. Gamble herself — exhibits clear signs of credibility. At the evidentiary hearing, Ms. Montero claimed to be an expert on Mexican immigration law, but the Court ruled that she was not competent to give expert testimony on that subject. (May 4 Tr. 52-54). In addition, Ms. Montero admitted to using an artificial intelligence-based large language model to translate documents from Spanish to English, which

translation resulted in at least one critical mistake. (*Id.* at 58-61). And Ms. Gamble previously made representations about provisional custody and the parties' settlement proposal that have since been proven false. Her explanations to this Court for those misstatements strain credulity.

**FINDINGS OF FACT**

The findings of fact that follow are based on the Court's careful review of the entire record. Except where otherwise indicated, the Court finds the fact recited to be true. Where the Court states a witness's perspective on a point, the Court finds that point to be from the witness's perspective, and not that the perspective is necessarily correct. Further factual findings are contained in the ensuing Conclusions of Law section.

**A. The Parties, Their Early Relationship, and the Birth of B.M.**

Mr. Mudge was born in Australia on May 12, 1976. (Joint Stip. ¶ 1). He is an Australian and U.S. dual citizen, and he holds a valid Mexican temporary residence permit. (*Id.*). He was a professional squash player for approximately 23 years until his retirement in 2020. (Pet. Decl. ¶ 2). He currently resides in Puerto Aventuras, Mexico. (*Id.*).

Ms. Gamble was born in the United States on July 24, 1986, and she is a U.S. citizen. (Joint Stip. ¶ 2). She previously held a Mexican temporary residence permit, which has since expired. (*Id.*). She owns an interior design firm and provides interior design services internationally. (*Id.*).

Mr. Mudge and Ms. Gamble met in New York City around January 2019. (Joint Stip. ¶ 4). They began to date exclusively almost immediately after

meeting. (Pet. Decl. ¶ 6). In May 2020, during the COVID-19 pandemic, they moved to Australia, where they were married approximately four months later, on September 29, 2020. (Joint Stip. ¶¶ 5-6; Resp. Decl. ¶¶ 4-5). Around November 2020, Ms. Gamble became pregnant with B.M. (Joint Stip. ¶ 7). The parties decided to relocate from Australia to the United States before the birth of B.M., purchasing a house in Port St. Lucie, Florida, in July 2021. (*Id.*). B.M. was born in Jupiter, Florida, on August 9, 2021. (*Id.* ¶ 8). He is currently four years old. (*See id.*).

**B. The Family's Relocation to Mexico**

After B.M. was born, Mr. Mudge and Ms. Gamble began to explore the possibility of relocating somewhere with a lower cost of living. (Pet. Decl. ¶ 13; Resp. Decl. ¶ 8). Around New Year's Eve in 2022, the family took a trip to Puerto Aventuras, Mexico. (Joint Stip. ¶ 9). According to Mr. Mudge, both he and Ms. Gamble were "immediately taken by Puerto Aventuras," especially its convenience of life and thriving expat community. (Pet. Decl. ¶ 14). They decided to visit Puerto Aventuras again for a month in June 2023. (Joint Stip. ¶ 9). Mr. Mudge described the month as a "trial run" for moving to Puerto Aventuras. (Pet. Decl. ¶ 14). The "trial run" was apparently successful, because on September 11, 2023, Mr. Mudge, Ms. Gamble, B.M., and their family dog, Teddy, officially moved to Puerto Aventuras. (Joint Stip. ¶ 10). That month, the parties purchased a property in Puerto Aventuras ("Casa Cun"), where Mr. Mudge still resides today and where B.M. was living before his removal to New York by Ms. Gamble. (*Id.* ¶ 11; Pet. Decl. ¶ 16). Around the

same time, the parties placed their residence in Florida for sale, which was completed in December 2023. (Joint Stip. ¶ 12; Pet. Decl. ¶ 15).

Soon after the family's arrival in Puerto Aventuras, the parties hired a full-time nanny, Holly Minkkinen, and enrolled B.M. in daycare as well as a local beach camp, both of which he attended for the next two years until his removal in September 2025. (Joint Stip. ¶ 13; Pet. Decl. ¶ 14). The parties also applied for and obtained temporary residency permits in Mexico. (Pet. Decl. ¶ 18). Mr. Mudge and B.M. currently hold three-year temporary residency permits that are set to expire in 2027, while Ms. Paisley held a one-year temporary residency permit that has since expired because she did not renew it for the three-year version held by Mr. Mudge and B.M. (Joint Stip. ¶¶ 1-3; Pet. Decl. ¶ 18). According to Mr. Mudge, after four years of being temporary residents, one can apply for permanent residency, which he intends to pursue for himself and B.M. (Pet. Decl. ¶ 18).

While living in Mexico, Ms. Gamble continued to operate her interior design business by managing her affairs remotely and traveling to the United States frequently. (Resp. Decl. ¶ 15; *see* Pet. Decl. ¶ 19). Ms. Gamble states that she is not legally authorized to work in Mexico (Resp. Decl. ¶ 23), though Mr. Mudge observes that she entered into a year-long lease for office space in Puerto Aventuras and hired local employees (Pet. Decl. ¶ 19). In addition, Ms. Gamble's parents purchased a condominium next to Casa Cun and spent several months in Puerto Aventuras every year. (Joint Stip. ¶ 15; Pet. Decl.

¶ 20). According to Mr. Mudge, Ms. Gamble's parents enjoyed spending time in Puerto Aventuras and being close to their only grandchild. (Pet. Decl. ¶ 20).

The parties dispute whether the family's relocation to Mexico was meant to be temporary or permanent. (*Compare* Pet. Decl. ¶ 14 ("During our [trial-run] month there, it became clear to us that Puerto Aventuras was an amazing opportunity for our family and we decided we would be moving there permanently."), *with* Resp. Decl. ¶ 13 (describing Mexico as a "temporary … arrangement" so that the parties could "save money to afford a more comfortable lifestyle when [they] returned home to the United States")). Nevertheless, even Ms. Gamble admits that Mexico was meant to be a "three-to-five-year arrangement" and that the family intended to stay "at least for a period of time." (Resp. Decl. ¶¶ 11-12). Moreover, given that the parties sold their Florida residence when they moved to Mexico, there was no alternative to Casa Cun during the time that the family resided in Puerto Aventuras, and the parties did not reach an agreement on where their next home would be. As Ms. Gamble stated in a contemporaneous text message to Mr. Mudge, "[a]s [B.M.] gets older[,] there are lots of co[a]stal or outdoorsy locations globally that are affordable and can work for us. Even in Mexico." (Ex. R-9 at 3).

**C. The Parties' Separation**

At some point between March and April 2025, the parties separated. (Joint Stip. ¶ 17). In January 2025, a few months before the separation, Ms. Gamble entered into a year-long lease for a studio apartment in New York City. (*Id.* ¶ 16). According to Mr. Mudge, Ms. Gamble's decision to rent the New York

City apartment was because "she was traveling there so frequently for work." (Pet. Decl. ¶ 21). On April 29, 2025, Ms. Gamble also entered into another year-long lease for a property near Casa Cun ("Casa Manglar"), which lease she did not terminate until January 2026. (Joint Stip. ¶ 19; May 4 Tr. 93). In May, after she and Mr. Mudge separated, Ms. Gamble moved from Casa Cun to Casa Manglar. (Joint Stip. ¶ 20). Mr. Mudge and B.M. continued to reside in Casa Cun, which was listed for sale in April 2025 but remains on the market today. (*Id.* ¶ 18; Pet. Decl. ¶¶ 22-23).

With respect to B.M., the parties agreed upon and implemented a week-on, week-off parenting schedule in Puerto Aventuras. (Pet. Decl. ¶ 23; May 4 Tr. 92-93). B.M. spent time and stayed overnight with each parent at both Casa Cun and Casa Manglar. (Pet. Decl. ¶ 23). At first, the parties attempted to resolve issues related to custody and finances amicably among themselves. (*Id.*). A settlement proposal sent by Mr. Mudge to Ms. Gamble on July 28, 2025, reflects that the parties contemplated (i) sharing legal and physical custody of B.M. on a week-on, week-off evenly split schedule, (ii) allowing B.M. to "stay in Puerto Aventuras until there is a decision made to move back to the United States," and (iii) "reevaluat[ing] every 12 months as to what is in the best interest for [B.M.'s] schooling and location." (Ex. P-31; May 4 Tr. 110).[2]

2 The Court notes that Ms. Gamble submitted a version of the same settlement proposal as one of her evidentiary hearing exhibits, in which exhibit the sentence "[B.M.] will stay in Puerto Aventuras until there is a decision made to move back to the United States" was shortened to "[B.M.] will stay in States." (Ex. R-17). During cross-examination, Ms. Gamble explained that "this must be in error," and her counsel later attributed the omission to a printer error in a letter to the Court. (May 4 Tr. 111-12). The Court will refrain from describing Ms. Gamble's submission as a doctored exhibit at this time, but

Each of the parties hired family law counsel in May 2025, with Ms. Gamble retaining counsel in both New York and Mexico and Mr. Mudge retaining counsel in New York. (Joint Stip. ¶¶ 21-23). According to Ms. Gamble, the parties agreed to get divorced in New York. (Resp. Decl. ¶ 34). On September 24, 2025, however, Ms. Gamble filed for divorce in Mexico. (Joint Stip. ¶ 28). Mr. Mudge did not learn about Ms. Gamble's divorce filing until about a month later. (Pet. Decl. ¶ 27). On October 15, 2025, during the pendency of the divorce proceedings, the Mexican court granted Ms. Gamble provisional care of B.M. (Joint Stip. ¶ 34; *see* Ex. P-3 ("Oct. 15 Mexican Court Order")). Nevertheless, the Mexican court did *not* grant Ms. Gamble custody of B.M. (*See* May 4 Tr. 60-61 (Ms. Montero, who is Ms. Gamble's Mexican counsel, acknowledging that "no court has granted provisional custody of B.M.")). In fact, the Mexican court made clear that "things [should] remain in the state in which they are currently found and [that] the minor with initials B.M. shall remain under the care of his mother … at the domicile they currently inhabit, [and that] this does not imply that provisional or definitive custody is granted to her[.]" (Oct. 15 Mexican Court Order at 2-3). In other words, the Mexican court did not terminate, restrict, or in any way change Mr. Mudge's custodial rights and parental authority over his son. Nor did the

it is deeply disappointed that her counsel did not review and catch a dispositive error in a critical and certified exhibit to the Court.

Mexican court give Ms. Gamble permission to relocate B.M., especially given its directive to maintain the status quo.[3]

On January 16, 2026, the Mexican court granted the parties' divorce. (Joint Stip. ¶ 35; Ex. P-4). Neither party appealed the order, meaning that the Mexican court's judgment is now final. (Joint Stip. ¶ 35). A week later, Mr. Mudge filed for permanent and definitive custody of B.M., which the Mexican court provisionally denied on February 10, 2026, on the grounds that Ms. Gamble had already been granted temporary provisional care during the pendency of the proceedings. (*Id.* ¶¶ 36, 38). And on January 31, 2026, Ms. Gamble filed for custody and visitation in New York family court, which proceedings the parties later agreed to stay pending this Court's decision on the Petition. (*Id.* ¶¶ 40, 42). Custody proceedings remain ongoing in Mexico. (*Id.* ¶ 43).

**D. B.M.'s Removal from Mexico to the United States**

On September 26, 2025, Ms. Gamble took B.M. and flew with him from Mexico to New York using one-way tickets that she had purchased three days before. (Joint Stip. ¶¶ 27-28). Ms. Gamble had taken B.M. to New York on several occasions before the September 26 removal, including for a few days between July and August 2025 and for less than a week between September 4

---

[3] In a declaration submitted in support of Ms. Gamble's opposition to the Petition, Ms. Montero initially stated that the Mexican court "granted Respondent provisional custody of B.M." (Dkt. #11-2 at 7-8). On cross-examination, however, Ms. Montero admitted to preparing the document in Spanish and then "us[ing] ChatGPT to help [her] translate it" into English, and she further acknowledged that it was a "mistake" to state that the Mexican court had granted provisional custody to Ms. Gamble. (May 4 Tr. 58-61). Once again, the Court is deeply disappointed that Respondent's counsel misrepresented a dispositive fact to the Court and did not use a reliable translation service.

and September 10, 2025. (*Id.* ¶¶ 24-25). After Ms. Gamble and B.M. landed in New York on September 26, 2025, however, she has not returned to Mexico with her son. Instead, on September 29, 2025, a few days after arriving, Ms. Gamble enrolled B.M. at the Learning Experience (*id.* ¶ 29), a school that she had previously toured in August 2025 without informing Mr. Mudge (Pet. Decl. ¶ 24; May 4 Tr. 93). Moreover, on October 7, 2025, Ms. Gamble entered into a year-long lease for a two-bedroom apartment in New York, even though she already had an existing lease for a studio apartment. (Joint Stip. ¶ 30). She also did not share the information about the two-bedroom apartment with Mr. Mudge. (Pet. Decl. ¶ 27).

A few days before B.M.'s removal, on September 22, 2025, Mr. Mudge underwent hip replacement surgery, which had been scheduled to take place at the start of Mr. Mudge's week off and Ms. Gamble's week with B.M. in terms of the parties' parenting arrangements. (Joint Stip. ¶ 26; Pet. Decl. ¶ 27). In other words, Ms. Gamble purchased the one-way tickets, took B.M. to New York, and enrolled him in a new school right as Mr. Mudge was undergoing and recovering from pre-planned surgery. In fact, Ms. Gamble informed Mr. Mudge for the first time of her and B.M.'s travel plans on their flight to New York on September 26, 2025. (Joint Stip. ¶ 28). In a text message to Mr. Mudge, Ms. Gamble explained that she "had a vip meeting pop up in NY [the next day] so [she] jumped on a flight with [B.M.]" and that they were "in the air." (Ex. P-21 at 1). She further justified her decision by telling Mr. Mudge that he was "not able to care for [B.M.] next week while [he was] recovering." (*Id.*). Mr. Mudge

objected, stating that "[t]his [wa]sn't [Ms. Gamble's] decision to make" and that she was "taking [their] son out of the country and not discussing it with" him, which Mr. Mudge considered to be "not right on any level." (*Id.* at 2).

Ms. Gamble's conduct in the ensuing weeks made clear that she had no intention of returning B.M. to Mexico despite her contrary and shifting representations to Mr. Mudge. On September 30, 2025, Mr. Mudge told Ms. Gamble that he was "good to take care of [B.M.]" and asked her to bring him back that day, given that it was Mr. Mudge's week of parenting. (Ex. P-21 at 3). In response, Ms. Gamble said she had already told Mr. Mudge that he was "unable to care for [B.M.] and that [she] needed to be in NYC for work this week," and she added that Mr. Mudge could come to New York to collect B.M. (*Id.* at 4). She also requested clearance from Mr. Mudge's doctor confirming that he could safely resume childcare before returning B.M. (*Id.*). Then, on October 6, 2025, the same day that B.M. started school at the Learning Experience, Ms. Gamble told the parties' housekeeper in Mexico that she planned to stay in New York longer because Mr. Mudge was still recovering from surgery and could not care for B.M. (Pet. Decl. ¶ 27; Ex. P-24). On October 12, 2025, after receiving Mr. Mudge's medical note clearing him for normal activities, Ms. Gamble rejected it for being "not specific" enough and written in "broken English." (Ex. P-21 at 9). She continued to refuse to bring B.M. back to Mexico, citing an illness that B.M. had developed as the reason for his inability to fly. (*Id.*). She also told Mr. Mudge not to "make any travel plans or unannounced visits." (*Id.*). And on October 13, 2025, after receiving

an updated medical note clearing Mr. Mudge for childcare, Ms. Gamble said B.M. "still ha[d] congestion and just had a bunch of diarrhea[.]" (*Id.* at 10; *see* Joint Stip. ¶ 32 ("Petitioner provided Respondent with a doctor's note stating that he was medically cleared to care for B.M.")).

For the rest of October 2025, B.M.'s illness was cited as Ms. Gamble's principal reason for keeping him in New York. At various points, she characterized the illness as a "cold," a "sinus infection turning to bronchitis," and eventually an "adenoid infection." (Ex. P-21 at 9, 14, 24). She refused to share details about B.M.'s medical condition with Mr. Mudge, including the full name of his pediatric doctor in New York. (*Id.* at 14-22). In the meantime, Mr. Mudge told Ms. Gamble that he was able to walk unaided up and down stairs with full functionality and to attend to B.M.'s recovery. (*Id.* at 9). He also expressed extreme dismay at Ms. Gamble's unilateral decisionmaking and failure to consult him about B.M. (*Id.* at 14-22; *see id.* at 14 (Mr. Mudge asking Ms. Gamble, "What's [B.M.] doing? I feel like I'm in the complete dark as to what he's been doing for the past 4 weeks. Who he's been spending time with. Who's been helping take care of him. Why aren't you sharing and keeping me in the loop?"); *id.* at 15 (Mr. Mudge stating that "[m]aking decisions without consulting each other is not in the best interest of our son!").

On October 28, 2025, when Mr. Mudge asked Ms. Gamble about their son, she informed him for the first time that she had filed for divorce in Mexico and that the Mexican court had granted her "temporary care and custody of [B.M.]" (Ex. P-21 at 24; Pet. Decl. ¶ 27). She added that "[i]t's best that [the

parties] move forward through the proper legal channels, and once there's more clarity from the court, [the parties] can plan a time for [Mr. Mudge] to visit [B.M.]" (Ex. P-21 at 24). Mr. Mudge responded by stating that he would fly to New York the next day to see B.M., but Ms. Gamble discouraged him by threatening that "[a]ny in-person visits w[ould] need to be arranged through the court process, as visitation ha[d] not been granted [to Mr. Mudge] at this time." (*Id.* at 24-25). As Ms. Gamble later admitted at the evidentiary hearing, her representations to Mr. Mudge about temporary custody and visitation arrangements were false. (May 4 Tr. 102 (Ms. Gamble acknowledging that she "did not have temporary custody at the time"); *id.* at 103 (Ms. Gamble agreeing with the Court's assessment that "[she] told the father of [her] child that he couldn't see [their] child without a court [order] and it was absolutely not true")).

By the end of October, Mr. Mudge had not seen his son for seven weeks and felt "as if [his] heart ha[d] been ripped out." (Ex. P-21 at 26; *see id.* ("All I want is to spend time with my son. I have loved and cared for him with every ounce of my being for 4 years.")). He was finally able to see his son in March 2026, approximately five and a half months after B.M.'s removal to New York, and only after he filed the Petition and this Court made clear that both parents should be able to see B.M. (Pet. Decl. ¶¶ 40-41 ("It was not until this Court stated that both parents should have visitation with B.M. that [Ms. Gamble] agreed for me to see B.M."); *see* Mar. 18 Tr. 15 (Ms. Gamble's attorney

responding affirmatively to the Court's question about whether Mr. Mudge "has the ability to see his son this week")).

### E. B.M.'s Health Issues and Mr. Mudge's Care for B.M.

B.M. has experienced several health issues before and after his removal from Mexico, but the Court finds that they are not unique to Mexico or require ongoing treatment in New York.

*First*, B.M. suffers from gastrointestinal issues. He had several serious episodes while he was living in Mexico. (Pet. Decl. ¶ 49; Resp. Decl. ¶¶ 38-39). Nevertheless, he also experienced infant diarrhea while living in Florida before the family's relocation to Mexico (May 4 Tr. 107-08), and he continues to have episodes of diarrhea in New York (*see* Ex. P-21 at 10-11).

*Second*, B.M. has experienced sinus infections. (Pet. Decl. ¶ 48; Resp. Decl. ¶ 40). In February 2026, B.M. underwent adenoid surgery in New York while under Ms. Gamble's care and without Mr. Mudge's input or presence. (Joint Stip. ¶ 37; Pet. Decl. ¶ 38 ("I was of course stunned that our young son was having surgery … and I had no information regarding the surgery.")). According to a medical evaluation performed by a doctor that the parties jointly retained for this case, "[t]he surgery seem[s] to have resolved [B.M.'s] sleep apnea issue and his recurrent sinus infection issue," and no further treatment is recommended at this time. (Ex. P-37).

*Third*, Ms. Gamble claims that B.M. exhibits early signs of dyslexia and requires a speech therapist. (Resp. Decl. ¶ 94; *see id.* ¶ 58 (Ms. Gamble explaining that speech therapy and dyslexia support are "non-existent" in

Puerto Aventuras)). Nevertheless, "the prevailing professional consensus is that a reliable formal diagnosis of dyslexia is generally possible no earlier than approximately five and a half to seven years of age — that is, after a child has received meaningful exposure to reading instruction (typically during kindergarten through second grade)." (Whitman Decl. ¶ 11). B.M. is not yet five years old.

Separately, Ms. Gamble raises several instances of what she characterizes as Mr. Mudge's inadequate care of B.M. Those alleged instances, which Mr. Mudge disputes, include (i) Mr. Mudge allowing B.M. to "eat directly from a very large block of cheddar cheese, rather than cutting off a portion for him" (Buttery Decl. ¶ 18), (ii) Mr. Mudge handing a kitchen knife to B.M., who asked to cut watermelon himself and proceeded to cut his own finger by accident (Minkkinen Decl. ¶ 54), (iii) Mr. Mudge tolerating B.M.'s frequent climbs onto the kitchen island, from which B.M. has fallen on at least one occasion (*id.* ¶¶ 52-53), (iv) Mr. Mudge allowing B.M. to collect broken glass on the street (*id.* ¶ 51), and (v) Mr. Mudge permitting B.M. to remain undressed when he refused to wear clothes (*id.* ¶¶ 44-50). (*See* Pet. Decl. ¶ 52 (Mr. Mudge disputing the allegations and providing more context)). At the same time, Mr. Mudge has provided years of hands-on care for B.M., including assuming day-to-day parenting responsibilities, organizing his recreational activities and social events, teaching him to swim and play various types of sports, and generally spending quality time together. (*Id.* ¶¶ 19, 50).

## CONCLUSIONS OF LAW

### A. Mr. Mudge Has Established a *Prima Facie* Case for Return

Under ICARA, the party petitioning for the child's return — here, Mr. Mudge — bears the burden of establishing by a preponderance of the evidence that the child has been wrongfully removed or retained. 22 U.S.C. § 9003(e)(1). In other words, Mr. Mudge must show that (i) "the child was habitually resident in one State and has been removed to or retained in a different State"; (ii) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (iii) "the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130-31. Here, the Court finds that Mr. Mudge has carried his burden on all three elements, thus establishing a *prima facie* case for B.M.'s return under the Hague Convention.

#### 1. Mexico Was B.M.'s Habitual Residence Before His Removal

The Supreme Court has instructed that "habitual residence," which is not defined by the Hague Convention, should be determined using a fact-specific inquiry that is based on the totality of the circumstances in each case. *Monasky*, 589 U.S. at 76-81. In other words, "[t]here are no categorical requirements for establishing a child's habitual residence — least of all an actual-agreement requirement for infants." *Id.* at 80-81. In this Circuit, courts generally consider two relevant factors in making the habitual-residence determination — namely, "the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared,"

as well as whether "the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent." *Gitter*, 396 F.3d at 134; *see, e.g.*, *Ochoa* v. *Perez*, No. 24 Civ. 4736 (NSR), 2025 WL 1031340, at *2 (S.D.N.Y. Apr. 7, 2025) (continuing to apply the Second Circuit's "two-prong inquiry" after the Supreme Court's decision in *Monasky*).

*First*, considering both "actions as well as declarations" in this case, *Gitter*, 396 F.3d at 134, the Court determines that at the time of the family's relocation to Mexico, the parties shared an intent of treating Puerto Aventuras as B.M.'s habitual residence. As recounted in the findings of fact, in September 2023, the parties decided to move the entire family from Florida to Puerto Aventuras, including themselves, B.M., and the family dog Teddy. (Joint Stip. ¶ 10). Once they arrived in Puerto Aventuras, the parties purchased Casa Cun, set up a life for B.M. by hiring a full-time nanny and enrolling B.M. in daycare and camp, and obtained temporary residence permits for themselves and B.M. (*Id.* ¶¶ 1-3, 11, 13). In addition, the parties sold their residence in Florida when they moved to Mexico, and they did not make any concrete plans for returning to Florida (or, for that matter, anywhere else in the United States). (*Id.* ¶ 12).

Ms. Gamble characterizes the move as "temporary," but her contemporaneous statements to third parties indicate that she viewed Mexico as a "three-to-five-year arrangement" and that she intended the family to stay "at least for a period of time." (Resp. Decl. ¶¶ 11-12). As Mr. Mudge correctly

argues, even when a move is intended for a limited period of time, it may still "evince[ ] a good degree of settled purpose and continuity" to effectively change the child's habitual residence. *Ermini* v. *Vittori*, 758 F.3d 153, 162 (2d Cir. 2014) (internal quotation marks omitted). (*See* Pet. FFCL 21-22). Here, unlike the cases cited by Ms. Gamble, the parties' actions and declarations evince a strong settled purpose of moving to and living in Puerto Aventuras on a continuous basis, even if for just a few years, such that B.M.'s habitual residence changed from the United States to Mexico. *Cf., e.g.*, *Nissim* v. *Kirsch*, 394 F. Supp. 3d 386, 391-94 (S.D.N.Y. 2019) (determining that the child's habitual residence did not change from Israel to the United States because the parties "only sought temporary housing" in California and "discussed their intent to remain in California on a temporary basis only" because of a specific job opportunity). (*See* Resp. FFCL 21-24).

Moreover, Ms. Gamble's arguments about conditional relocation are inapposite because the parties did not base their move to Mexico on certain explicit conditions, and they certainly did not intend to move back to the United States if those conditions were not satisfied. (*See* Resp. FFCL 24-26, 28-35). In fact, at the time of the relocation, Ms. Gamble was open-minded about staying in Mexico or moving to other coastal, outdoorsy, and affordable locations globally as B.M. grew up. (Ex. R-9 at 3). Put differently, she did not intend to move back to the United States should Mexico fail to meet the parties' expectations and requirements, thereby indicating at least a shared intent of abandoning the United States as B.M.'s habitual residence. *Cf. Mota* v.

*Castillo*, 692 F.3d 108, 115 (2d Cir. 2012) (determining that because the petitioner "intended for [the child] to live in the United States *only if* she herself could join the household and continue to raise her child," Mexico remained the child's habitual residence when the condition was not satisfied). Given that the parties sold their residence in Florida, it is unclear to the Court where B.M. would have returned to in the United States. As Mr. Mudge contends, "[t]he parties retained no home in the United States, in Australia, or anywhere else, leaving Mexico as the only country in which B.M. was settled and the only home he had." (Pet. FFCL 23). And the parties' settlement proposal reflects that the plan had been to keep B.M. "in Puerto Aventuras until there [wa]s a decision made to move back to the United States." (Ex. P-31; May 4 Tr. 110).

*Second*, regardless of whether the parties shared the intent of habitually residing in Puerto Aventuras, the Court separately determines that B.M. has acclimatized to the location. At the time of his removal, B.M. had spent the majority of his young life living continuously in Puerto Aventuras, where he had a full-time nanny, friends from daycare and beach camp, and medical caregivers, and where he was learning to play sports and leading an active lifestyle. (Pet. FFCL 22-23; *see, e.g.*, Pet. Decl. ¶ 19; May 4 Tr. 91-92). To be sure, B.M. was not enrolled in formal education in Mexico, but he was not yet of proper schooling age when he was removed. Furthermore, the Court is not persuaded by any of the relevant case law that Ms. Gamble cites from this Circuit. (*See* Resp. FFCL 26-28). Unlike the child in *Paz* v. *Mejia De Paz*, 169 F. Supp. 2d 254 (S.D.N.Y. 2001), whose country of residence changed at least

nine times, *id.* at 258, B.M. had relocated only once in his life from Florida to Puerto Aventuras before his removal in this case. And in *Guzzo* v. *Cristofano*, 719 F.3d 100 (2d Cir. 2013), the petitioner in that case "had explicitly abandoned any argument" regarding acclimatization. *Id.* at 105.

In light of the circumstances of the family's relocation to Mexico and the specific facts of this case, the Court determines Mexico to be B.M.'s place of habitual residence when he was removed by Ms. Gamble to New York.

**2. B.M.'s Removal Was in Breach of Mr. Mudge's Custodial Rights Under Mexican Law**

The Hague Convention provides that a child's removal is wrongful if "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention[.]" Hague Convention, art. 3(a). In addition, the Hague Convention defines rights of custody to include "rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence[.]" *Id.*, art. 5.

Mexican law governs the rights of custody in this case. Indeed, Mexico's law of custody, also known as *patria potestas*, covers a broad set of rights and obligations, including "the right to cho[o]se the minor's place of domicile." *Mota*, 692 F.3d at 117. As Ms. Gamble concedes, no Mexican court has granted her provisional or final custodial rights over B.M., meaning that Mr. Mudge retains his custodial rights under Mexican law. (*See* May 4 Tr. 60-61 (Ms. Montero acknowledging that "no court has granted provisional custody of

B.M.”); Joint Stip. ¶ 43 (stating that custody proceedings remain ongoing in Mexico)). In fact, the Mexican court made clear that “things [should] remain in the state in which they are currently found and [that] the minor with initials B.M. shall remain under the care of his mother ... at the domicile they currently inhabit, [and that] this does not imply that provisional or definitive custody is granted to her[.]” (Oct. 15 Mexican Court Order at 2-3). By unilaterally removing B.M. to New York without Mr. Mudge’s consent or input, Ms. Gamble clearly breached Mr. Mudge’s custodial rights under Mexican law, specifically his right to determine B.M.’s place of domicile. She also violated the Mexican court’s order to continue to care for B.M. at the domicile they inhabited in Mexico as part of its grant of provisional care. (*See id.*).

Ms. Gamble’s arguments to the contrary completely miss the point. (*See* Resp. FFCL 36-42). To begin, Mr. Mudge need not exercise exclusive or final custody over B.M. to have a say in the child’s place of residence. Moreover, Ms. Gamble’s removal of B.M. is not merely temporary international travel. B.M. has been removed to and retained in New York for over nine months at this point. Even Ms. Gamble’s Mexican attorney recognized at the evidentiary hearing that if her client was “planning on relocating to New York,” she would have told Ms. Gamble that she did not have “the right to take her son indefinitely.” (May 4 Tr. 70). Therefore, under the circumstances of this case, the Court determines that Ms. Gamble’s removal of B.M. to New York was wrongful and in breach of Mr. Mudge’s custodial rights under Mexican law.

**3. Mr. Mudge Was Exercising His Custodial Rights at the Time of B.M.'s Removal**

The parties do not dispute that Mr. Mudge was actively exercising his custodial rights when B.M. was removed from Mexico. Based on the week-on, week-off parenting schedule that the parties had previously agreed upon and implemented, B.M. had been in Mr. Mudge's care at Casa Cun until the latter's hip replacement surgery on September 22, 2025. (Pet. Decl. ¶¶ 23, 27; May 4 Tr. 92-93). In addition, Mr. Mudge expected and asked for B.M.'s return to his care the following week. (*See, e.g.*, Ex. P-21 at 3).

**B. Ms. Gamble Has Failed to Establish Grave Risk of Harm to B.M. by Clear and Convincing Evidence**

The question that remains is whether Ms. Gamble has established an exception to repatriation under the Hague Convention. Here, Ms. Gamble has invoked only the "grave risk" exception. Where the petitioner has established a *prima facie* case for the repatriation of an abducted child, Article 13(b) of the Hague Convention relieves a court from the obligation to order repatriation if "there is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Under ICARA, the invocation of the "grave risk exception" requires the responding parent to establish by "clear and convincing evidence" that such a risk exists. 22 U.S.C. § 9003(e)(2)(A). While such a determination is "fact-intensive," the Second Circuit has advised that courts should interpret the exception "narrowly, lest it swallow the rule." *Souratgar* v.

*Lee*, 720 F.3d 96, 103-04 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Simcox* v. *Simcox*, 511 F.3d 594, 604 (6th Cir. 2007)).

In this Circuit, to qualify as a grave risk of harm for purposes of Article 13(b), "[t]he potential harm to the child must be severe[.]" *Souratgar*, 720 F.3d at 103. Indeed, the circumstances that give rise to a grave risk of harm include those in which "the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," as opposed to those in which "repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences[.]" *Blondin* v. *Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) ("*Blondin IV*"). Moreover, whether a grave risk of harm exists depends "not only [on] the magnitude of the potential harm but also [on] the probability that the harm will materialize." *Souratgar*, 720 F.3d at 103.

**1. B.M.'s Health Issues and Mr. Mudge's Alleged Instances of Inadequate Care Do Not Constitute a Grave Risk of Harm**

Ms. Gamble contends that B.M.'s medical condition and Mr. Mudge's neglectful care would place the child in an intolerable situation if returned to Mexico, but those risks, even if materialized, would not rise to the level of severe harm contemplated by the relevant case law. (*See* Resp. FFCL. 42-50).

*First*, as this Court has made clear in its findings of fact, B.M.'s health issues are not unique to Mexico, nor do they require ongoing treatment in New York. Since birth, B.M. has suffered from diarrhea and other gastrointestinal issues. (*See* Pet. Decl. ¶ 49; Resp. Decl. ¶¶ 38-39; May 4 Tr. 107-08; Ex. P-21

at 10-11). To be sure, B.M. experienced particularly severe episodes while living in Mexico, perhaps due to the water filtration system in Casa Cun (an issue since resolved), but the Mexican health care system is capable of treating those conditions. (*See* Pet. Decl. ¶ 49). With respect to B.M.'s sinus infections, the medical expert jointly retained by the parties has opined that no further treatment is necessary given B.M.'s adenoid surgery in February 2026. (Joint Stip. ¶ 37; Ex. P-37). And B.M.'s apparent risk of developing dyslexia and need for speech therapy are not on the same level of severity as the kinds of developmental harms evaluated by courts in other cases. *Cf., e.g.*, *Ermini*, 758 F.3d at 159, 165-66 (determining that the child, who suffered from severe autism, would face a grave risk of harm if removed from his therapy program).[4] In any event, B.M. has not received a formal diagnosis of dyslexia, as he is not old enough to be meaningfully evaluated. (*See* Whitman Decl. ¶ 11).

*Second*, the proffered instances of Mr. Mudge's alleged neglect of B.M. do not establish "a real risk of … hurt[ing the child], physically or psychologically, as a result of repatriation." *Blondin IV*, 238 F.3d at 162. Setting aside Mr. Mudge's factual challenges to Ms. Gamble's allegations and accepting them as true for purposes of this analysis, the Court finds that those instances do not give rise to an inference of domestic violence or severe psychological abuse.

---

[4] Ms. Gamble cites another international child abduction case adjudicated by this Court, *Mene* v. *Sokola*, No. 22 Civ. 10333 (KPF), 2024 WL 4227788 (S.D.N.Y. Sept. 17, 2024), for the proposition that disruptions in developmental programming — including speech-language therapy — could cause a grave risk of harm. (*See* Resp. FFCL 45-46). But in *Mene*, this Court explicitly stated that it did "not opine herein on whether [the child's] loss of access to the services he currently receives would, in and of itself, constitute a grave risk of harm[.]" *Id.* at 20.

Unlike in *Blondin IV*, where the Second Circuit affirmed a sister court's finding that return would almost certainly result in a recurrence of the children's traumatic stress disorder due to their father's physically and emotionally abusive treatment, 238 F.3d at 160, 163, or in *Mene* v. *Sokola*, No. 22 Civ. 10333 (KPF), 2024 WL 4227788 (S.D.N.Y. Sept. 17, 2024), at *19, where this Court found that the child was at grave risk of witnessing physical and psychological abuse of his mother by his father and of suffering physical abuse himself, the most that can be said about Mr. Mudge here is that he allowed his son to eat from whole blocks of cheese, run around the house naked, and accidentally injure himself by being an active, curious kid who occasionally played with sharp objects. That is hardly inadequate care, let alone domestic violence and psychological abuse. On the contrary, the Court finds Mr. Mudge's testimony about his love, dedication, and care for his son to be credible. (*See, e.g.*, Pet. Decl. ¶ 45 ("I may not be a perfect person, but I dedicated 100% of myself to my son and will continue to do so.")). Therefore, the Court does not believe that B.M. is at risk of being harmed when he returns to the care of his father in Mexico.

Because the Court has determined that there is no grave risk of harm, it need not consider the availability of protective and ameliorative measures in Mexico. *See, e.g.*, *Grano* v. *Martin*, 443 F. Supp. 3d 510, 544 (S.D.N.Y. 2020).

### 2. Ms. Gamble Can Travel to Mexico Without Fear of Facing Criminal Prosecution

Finally, as an ancillary issue that does not affect this Court's assessment of B.M.'s risk of harm, Ms. Gamble's own risk of harm upon returning to Mexico is low. Ms. Gamble claims that she cannot safely return to or remain in Mexico to care for B.M. because Mr. Mudge has pursued a criminal investigation against her. (Resp. FFCL 47-49). But Mr. Herrera, Mr. Mudge's Mexican counsel, testified at the evidentiary hearing that no Amber Alert has been issued, and that Mr. Mudge has filed for a dismissal of the criminal case. (May 4 Tr. 38, 43). As a result, the Court does not believe that Ms. Gamble faces a credible risk of arrest upon entering Mexico.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Petition, finding that Mr. Mudge has established a *prima facie* case of wrongful removal and that repatriation of B.M. to Mexico would not expose him to a grave risk of harm. The child is ORDERED returned to Mexico on or before **August 7, 2026**. The parties are directed to meet and confer and, to the extent possible, come to an agreement as to the proposed travel details.

In addition, pursuant to 22 U.S.C. § 9007, Ms. Gamble is ORDERED to pay the necessary expenses incurred by Mr. Mudge during this proceeding, including legal fees and costs. The parties are ORDERED to meet and confer and determine whether they can agree upon a figure for the fees and costs, and thereby stave off additional litigation that would warrant "fees on fees." If the parties are unable to resolve the issue of fees and costs on or before **August 7,**

**2026**, they are directed to submit a joint letter on that date proposing a briefing schedule for the Court's consideration.

The Clerk of Court is directed to terminate the pending motion at docket entry 3.

SO ORDERED.

Dated: July 8, 2026
New York, New York

KATHERINE POLK FAILLA
United States District Judge